**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LESPIA KING,

*Plaintiff-Appellee,*

v.

GEORGE M. MCMILLAN,

*Defendant-Appellant,*

and

OCTAVIA JOHNSON,

*Defendant.*

No. 08-1667

LESPIA KING,

*Plaintiff-Appellee,*

v.

OCTAVIA JOHNSON, in her official capacity as Sheriff of the City of Roanoke,

*Defendant-Appellant,*

and

GEORGE M. MCMILLAN,

*Defendant.*

No. 08-1713

Lespia King,

              *Plaintiff-Appellee,*

              v.

Octavia Johnson, in her official capacity as Sheriff of the City of Roanoke,

              *Defendant-Appellant,*

              and

George M. McMillan,

              *Defendant.*

No. 08-1974

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, District Judge.
(7:05-cv-00521-sgw-mfu)

Argued: October 30, 2009

Decided: February 3, 2010

Before MICHAEL, KING, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Michael wrote the opinion, in which Judge King and Judge Agee joined.

**COUNSEL**

**ARGUED**: John Adrian Gibney, Jr., THOMPSON MCMUL-LAN, PC, Richmond, Virginia; Elizabeth Kay Dillon,

GUYNN, MEMMER & DILLON, PC, Salem, Virginia, for Appellants. Terry Neill Grimes, GRIMES & WILLIAMS, PC, Roanoke, Virginia, for Appellee. **ON BRIEF:** Melvin E. Williams, GRIMES & WILLIAMS, PC, Roanoke, Virginia, for Appellee.

---

**OPINION**

MICHAEL, Circuit Judge:

Lespia King, a former deputy in the sheriff's office for the City of Roanoke, Virginia, sued Sheriff George McMillan in his official capacity under Title VII for sexual harassment and in his individual capacity under Virginia law for battery. While King's suit was pending, Octavia Johnson replaced McMillan as sheriff, and the district court substituted Johnson as the defendant in her official capacity in King's Title VII claim. The jury found for King on both claims. On appeal Sheriff Johnson argues that because each sheriff in Virginia is by state law a singular entity with an independent tenure, she could not be substituted in her official capacity as the successor to McMillan in the Title VII claim. Because acceptance of this argument would allow state law to override Title VII in violation of the Supremacy Clause, we conclude that Johnson's substitution was proper. Both Johnson and McMillan challenge the district court's rulings on the admission of certain evidence and the court's denial of their motions regarding liability and damages allowable. For the reasons explained below, we also reject these challenges. Accordingly, the judgments against both Johnson and McMillan are affirmed.

I.

A.

In August 2005 Lespia King, who had served as a deputy in the Roanoke sheriff's office, sued Sheriff George McMil-

lan in the Western District of Virginia. King sued McMillan
in his official capacity for sexual harassment in her employ-
ment under Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. § 2000e *et seq.*, and in his individual
capacity for battery under Virginia state law. While the suit
was pending, Sheriff McMillan lost a reelection bid to Sheriff
Octavia Johnson. Thereafter, the district court, invoking Fed-
eral Rule of Civil Procedure 25(d), substituted Johnson in her
official capacity as the defendant in King's Title VII claim.
Because King prevailed at trial, we recite the facts in the light
most favorable to her. *ABT Bldg. Prods. Corp. v. Nat'l Union
Fire Ins. Co. of Pittsburgh*, 472 F.3d 99, 113 (4th Cir. 2006).

B.

In the summer of 2000, when she was twenty-two years
old, King started her first full-time job as a jail deputy, work-
ing for Sheriff McMillan. Although Sheriff McMillan told his
employees that he did not tolerate sexual harassment, he qual-
ified this avowal by informing them that he was a "touchy-
feely person" and that he liked touching people when he
talked with them. J.A. 141. This self-characterization was an
understatement when it came to McMillan's interactions with
King during the four years she worked as one of McMillan's
deputies.

Every six or eight weeks, on average, King had an encoun-
ter with McMillan during which McMillan made her uncom-
fortable by touching her in sexually aggressive ways and by
making inappropriate (or suggestive) comments. The offen-
sive remarks began during King's job interview with McMil-
lan, when he told her that she was an attractive woman who
would be "hit[ ] on" by male police officers. J.A. 266. There-
after, when King encountered McMillan at work, he insisted
on hugging her. King responded by "tens[ing] up" and trying
to hug McMillan from the side to avoid frontal contact, but
McMillan would grab her for a more invasive hug, slide his

arms down her back, and place them around her buttocks. J.A. 263. McMillan also told King that he liked her hair long.

About a month after King started her job, McMillan was at the shooting range and happened to notice that King was having difficulty putting on her new leather gun belt. Unsolicited, McMillan stepped in to assist, touching King repeatedly in the waist area as he inserted the fasteners around her inner belt. This incident embarrassed King and made her "very uncomfortable." J.A. 267. McMillan's recurring harassment caused King to dread having contact with him; when she could, she would hide to avoid him.

King was especially intimidated by McMillan for two reasons. First, he controlled her job and working conditions, and there was no one superior to him in the chain of command. Second, he was "physically overwhelming" — six feet four inches tall, weighing 270 pounds. J.A. 323. King, on the other hand, was five feet four inches tall and weighed about 120 pounds when she began working for McMillan.

In 2003 King met privately with McMillan to request a shift transfer. Several times during the meeting McMillan patted King's knee or touched her leg. He also asked her to sit on his lap and told her that she would have to choose him over her boyfriend (also a sheriff's office employee) if she wanted a transfer or promotion. Worried that McMillan would not approve the shift transfer otherwise, King sat on McMillan's lap and gave him a hug. McMillan then asked for a kiss. To get out of the situation, King tried to give McMillan a "dry peck" on the cheek, but he turned his head so that the kiss landed on his lips. J.A. 272.

Sometime later, at a regional jail association dinner, McMillan seized the opportunity to take further liberties with King. McMillan greeted King by hugging her, sliding his hands downward, and placing them around her buttocks. McMillan then told King that he would hold her until her boy-

friend noticed and became jealous. As word of the incident spread, several of King's coworkers commented to her that she had been "struck by the gropealope," a phrase used by some to describe McMillan and his harassment. J.A. 275. King was "very embarrass[ed]" because "[i]t seemed like everybody knew that [she] had been pawed at [and] grabbed in public at a dinner." J.A. 276. After these incidents King suffered health problems, including weight gain, temporomandibular joint disorder (TMJ), sleeplessness, and nightmares about McMillan.

By early 2004 King had concluded that working under McMillan was intolerable, and she applied for another job. McMillan learned of this development, and on March 10, 2004, he called King into a conference room and shut the door. He urged her not to quit. He told her that she "could have a great career" in his office and gain an immediate promotion to the "position that [she] wanted" (working in the courtroom), if she would just choose him over her boyfriend. J.A. 278. McMillan also told King that she was very attractive, that he liked her longer hair style, that her "legs looked really, really good" in the skirt she had worn to the jail association dinner, and that she would be dating him if he were younger. J.A. 279. At the end of the meeting McMillan asked King for a hug, grabbed her around her waist, and pulled her down to sit on his lap. McMillan told King that he would not let her go until she gave him a kiss. King tried to give him a peck on the cheek, but McMillan insisted upon a "real kiss." J.A. 280. After McMillan forced a full kiss on King's lips, she ran out of the room into a restroom, where she cried for about ten minutes. King submitted a letter of resignation several days later.

The district court admitted testimony, over objection from McMillan and Johnson, from other women who worked for McMillan, either as employees or providers of contractual services, and who were sexually harassed by him. The women testified that McMillan made inappropriate sexual remarks to

them, asked them for kisses and hugs, and touched them in ways that made them feel uncomfortable.

## C.

The jury returned liability verdicts for King on both the Title VII and battery claims. The jury awarded King $50,000 in compensatory damages on the Title VII claim, $175,000 in compensatory damages on the battery claim, and $100,000 in punitive damages on the battery claim. The court remitted the compensatory damages on the battery claim to $50,000, and the judgment order provided that there could be only one recovery for compensatory damages, not to exceed $50,000.

Johnson and McMillan both appeal. Johnson argues that the district court improperly substituted her under Rule 25(d) as a defendant, in her official capacity, in King's Title VII claim. Both Johnson and McMillan challenge the district court's admission of the testimony from other women, who described McMillan's harassment of them. McMillan challenges the court's denial of his motion for judgment as a matter of law on the battery claim, its allowance of punitive damages on that claim, and its denial of his motion for a new trial. Johnson also claims that the district court's evidentiary rulings entitle her to a new trial.

## II.

## A.

Sheriff Johnson contends that the district court erred in substituting her, under Federal Rule of Civil Procedure 25(d), as the defendant in place of McMillan in King's Title VII claim, which was filed against McMillan in his official capacity. Johnson argues that she, in her official capacity, cannot be substituted as McMillan's successor because under Virginia law "her service as Sheriff beg[an] an entire new office, unrelated to McMillan's regime." Appellant's Br. at 13. We reject

Johnson's argument because the Supremacy Clause does not permit the use of state law to cut off — through denial of Rule 25(d) substitution — a Title VII (official capacity) claim brought against a state official who leaves office while the claim is pending.

The Constitution of Virginia requires "the qualified voters of each county and city" to elect a sheriff. Va. Const. art. VII, § 4; *see also* Va. Code Ann. § 15.2-1600 (repeating the constitutional requirement). Sheriffs appoint their own deputies, Va. Code Ann. § 15.2-1603, and a deputy's term extends for the term of the appointing sheriff, *see id.* (providing that deputy may perform duties "during [appointing sheriff's] continuance in office"); *Ramey v. Harber*, 431 F. Supp. 657, 663 (W.D. Va. 1977), *rev'd in part on other grounds*, 589 F.2d 753 (4th Cir. 1978). These provisions, Johnson maintains, confirm that Virginia law does not create an institutional "sheriff's office." Rather, she claims that each sheriff is a "singular entity," circumscribed by his or her term of office, who is "legally independent" of predecessors and successors. Appellant's Br. at 14. Because Virginia law creates each sheriff as a separate and independent entity, Johnson claims that she cannot be substituted under Rule 25(d) in her official capacity in King's Title VII claim to be liable for McMillan's conduct during his term.

If we accepted Johnson's argument, it would permit states to draft laws defining state and local offices in such a way as to limit the liability of their occupants under federal law. Regardless of whether Johnson reads Virginia law correctly with respect to the circumscribed authority of an individual sheriff, Virginia law cannot override Title VII employer liability. The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, "[u]nder the Supremacy Clause of the Federal Constitution,"

the "relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138 (1988) (internal quotations and citations omitted). The 1972 amendments to Title VII expanded the statute "to bring the States [and their political subdivisions] within its purview," and the Supreme Court has held that these amendments are an express abrogation of state sovereign immunity. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 448-49 & n.2, 457 (1976). In sum, state law demarcations of particular offices cannot be used to cut off the (federal) Title VII rights of state and local employees.

The district court properly concluded that Virginia law could not bar Sheriff Johnson's substitution, in her official capacity, as the defendant in King's Title VII claim when Johnson succeeded McMillan as sheriff. Rule 25(d) provides that an "action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." The advisory committee notes confirm that the rule is "merely a procedural device for substituting a successor for a past officeholder." Fed. R. Civ. P. 25(d) advisory committee's note (1961 amendment). The rule "does not affect any substantive issues which may be involved in the action." *Id.*

Sheriff Johnson argues that because she is a singular and independent entity under Virginia law, she cannot be a successor under Rule 25(d). Johnson misunderstands what it means to be a successor under the rule. It simply means that she followed Sheriff McMillan as sheriff of the City of Roanoke and that King's Title VII claim against Sheriff McMillan in his official capacity did not abate when he left office. Rather, the official capacity claim continues in the name of Sheriff Johnson, who is not *personally* liable for Title VII violations committed during Sheriff McMillan's term. Rule 25(d)

thus protects the public employee who may need more than the original Title VII defendant's term of office to litigate her official capacity claim.

Our court has not allowed the argument that each Virginia sheriff is a legally separate entity to interfere with the determination of an appropriate remedy under Title VII. In *United States v. Gregory*, 871 F.2d 1239, 1246 (4th Cir. 1989), we rejected a Virginia sheriff's assertion that his separate and independent status under state law precluded an award of injunctive relief against him under Title VII for the discriminatory practices of a prior sheriff. As we noted, "[u]nder federal law, Title VII remedies have not been limited to correcting only ongoing discriminatory policies." *Id.* "District courts clearly have the authority and should exercise the power to grant injunctive relief even *after apparent discontinuance* of unlawful practices." *Id.* (emphasis added). Although *Gregory* addressed injunctive relief, its reasoning applies to monetary relief: this relief should not be denied because the discriminatory acts were committed by a prior sheriff. *See* 42 U.S.C. §§ 1981a(b), 2000e-5(g)(1) (providing for both injunctive and monetary relief).

We affirm the district court's decision to substitute, pursuant to Rule 25(d), Sheriff Johnson in her official capacity as defendant in place of Sheriff McMillan with respect to King's Title VII claim.

### B.

McMillan and Johnson argue that the district court erred in admitting the testimony of other women who said they were sexually harassed by McMillan while they worked for him in the sheriff's office. We review a district court's rulings on the admission of evidence for abuse of discretion. *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006). The district court ruled that the testimony of other victims was admissible

because it was relevant to King's Title VII claim and because its probative value outweighed the risk of prejudice.

Testimony from other employees describing their own experiences of harassment by the defendant is often relevant to a plaintiff's hostile work environment claim. *Fox v. GMC*, 247 F.3d 169, 179 (4th Cir. 2001) (pointing to testimony of other employees regarding supervisors' treatment in concluding that plaintiff presented sufficient evidence of hostile work environment under the Americans with Disabilities Act).

Here, the district court properly determined that the testimony of the other women was relevant to two elements of King's hostile work environment claim: (1) whether McMillan's unwelcome conduct was because of King's sex, and (2) whether the unwelcome conduct was sufficiently severe or pervasive to create a hostile work environment. *See Ziskie v. Minetta*, 547 F.3d 220, 224 (4th Cir. 2008) (detailing elements of hostile work environment claim). Further, the court took the precaution of instructing the jury that the testimony of others was relevant to the "severe or pervasive" element only if King "was aware of [the harassment described in the testimony] during the course of her employment." J.A. 490S. As for testimony about incidents of harassment that King was not aware of, the court correctly instructed the jury that this testimony was relevant to the element of whether McMillan's unwelcome conduct toward King was because of her sex. *See, e.g.*, *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 110 (3d Cir. 1999) (holding that "plaintiff's knowledge of harassment or pervasively sexist attitudes is not . . . a requirement for admitting testimony on those subjects" because testimony is probative of discriminatory intent). In an effort to prevent the introduction of testimony about McMillan's harassment that King was unaware of, Johnson's counsel offered to stipulate that if there was sexual harassment, it was because of King's sex. The district court did not abuse its discretion in rejecting the stipulation on the ground that the testimony was relevant to prove an element of the Title VII claim, even

though the existence of the element (because of sex) was fairly obvious. Further, the court conducted a Federal Rule of Evidence 403 analysis and concluded that the probative value of the testimony concerning conduct that King was unaware of was not substantially outweighed by the danger of unfair prejudice. The court further concluded that it could avoid unfair prejudice by only admitting testimony of harassment that occurred during "the same timeframe" of King's employment. J.A. 158. "Rule 403 judgments are preeminently the province of the trial courts," *United States v. Love*, 134 F.3d 595, 603 (4th Cir. 1998), and the district court's careful analysis in this case merits our deference.

McMillan argues that the district court erred by not expressly instructing the jury that the testimony of female employees was relevant only to the Title VII claim and that it could not be considered in the state-law battery claim against McMillan. The prejudice caused by the court's failure to give this specific instruction, McMillan contends, is evidenced by the fact that the jury awarded King significantly more damages on the battery claim ($175,000 compensatory and $100,000 punitive) than the damages on the Title VII claim ($50,000 compensatory). McMillan maintains that the punitive aspect that the district court believed was included in the compensatory damages for battery stemmed from the jury hearing the testimony of other female employees.

We review the district court's decisions on jury instructions for abuse of discretion. *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 191 (4th Cir. 2003). "Instructions will be considered adequate if construed as a whole, and in light of the whole record, [they] adequately [informed] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the existing party." *Id.* (internal quotations omitted). "If we find the instructions flawed, we will not reverse unless the error seriously prejudiced the challenging party's case." *Id.*

The instructions regarding the testimony of the other female employees were adequately keyed to the elements of King's Title VII hostile work environment claim. The district court's refusal to give McMillan's instruction with respect to limiting this testimony to the Title VII claim did not amount to an abuse of discretion. Taken as a whole, the instructions correctly explained the law and did not comingle King's two claims. The interrogatories provided to the jury separated King's two claims into (1) whether "sexual harassment in her work place was so pervasive or severe as to alter the terms of her employment and create a hostile work environment" and (2) whether "McMillan battered King." J.A. 490D. The instructions regarding the testimony of other female employees referred to these employees' "alleged incidents of sexual harassment by George McMillan." J.A. 490S. The instructions then said that the evidence was received as evidence of whether McMillan's harassment of King was based on her sex and whether it was sufficiently severe or pervasive. *Id.* The clear implication of the instructions was that the testimony of the other women was relevant only to King's Title VII claim. Further, the court reduced the risk of confusion by instructing the jury that the testimony was not character evidence. Finally, even if we assume that there was some prejudice to McMillan on the battery claim as a result of the testimony of the other women and the instructions, the court took sufficient curative measures by remitting the compensatory damages for battery to $50,000 — a $125,000 reduction.

## C.

McMillan argues that the district court erred in denying his Federal Rule of Civil Procedure Rule 50 motion for judgment as a matter of law on King's battery claim because the evidence established that King consented to McMillan's touching at the March 10, 2004, meeting. We review de novo a district court's denial of a Rule 50 motion. *ABT Bldg. Prods. Corp.*, 472 F.3d at 113. "[T]he issue for assessment on appeal is whether there was a legally sufficient evidentiary basis for

a reasonable jury, viewing the evidence in the light most favorable to the prevailing party, to find for that party." *Id.* "If reasonable minds could differ about the verdict, we are obliged to affirm." *Id.*

"The tort of battery is an unwanted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003). The question of whether a touching was consented to is for the jury. Here, a reasonable jury could easily decide that King's compliance with Sheriff McMillan's request for a kiss in March 2004 was motivated by fear and did not amount to consent. The facts, viewed in the light most favorable to King, establish that she was alone and behind closed doors with a man who controlled her job and who was physically overpowering. McMillan forced the one-on-one meeting with King to persuade her — against her will — to remain in his employment, a circumstance that amplified her anxiety and fear. Part of her fear of McMillan stemmed from his ultimate authority, including his ability, through unfavorable recommendations, to make it difficult for her to work in her chosen field (law enforcement). McMillan's request for a kiss came after he commented on King's physical attractiveness, after he suggested that the two of them would be dating were it not for King's boyfriend, and most important, after he grabbed her around the waist and pulled her down onto his lap. McMillan kept his arms around King's waist and said he would not let her go until she kissed him. King tried to mitigate the offensiveness of this inescapable, uninvited contact by giving McMillan a "peck on the cheek." J.A. 280. Unsatisfied, McMillan demanded a "real kiss." *Id.* King reluctantly complied by pursing her lips, but McMillan, ever-determined, turned the kiss into an invasive one. Thereafter, King fled the room and cried for about ten minutes. There was a sufficient evidentiary basis for the jury to conclude that King did not consent to the physical maltreatment she suffered at the hands of McMillan on March 10, 2004. McMillan's Rule 50(b) motion was properly denied.

## D.

McMillan argues that the district court committed further error in handling the state-law battery claim against him, asserting that the court (1) should not have given a punitive damages instruction, (2) should have further remitted King's compensatory damages, and (3) should have remitted the punitive damages award.

When there is no constitutional challenge to a jury's award of punitive damages, a "federal district court reviews such an award by applying the state's substantive law of punitive damages under standards imposed by federal procedural law." *Atlas Food Sys. & Servs. v. Crane Nat'l Vendors*, 99 F.3d 587, 593 (4th Cir. 1996). "Thus, the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Id.* (internal citations and quotations omitted). We review the district court's determination under these standards for an abuse of discretion. *Defender Indus. v. Nw. Mut. Life Ins. Co.*, 938 F.2d 502, 506 (4th Cir. 1991).

Virginia law authorizes punitive damages not only for malicious conduct but also for "negligence which is so willful or wanton as to evince a conscious disregard of the rights of others." *Etherton v. Doe*, 597 S.E.2d 87, 90 (Va. 2004). "[A] jury's award of damages may not be set aside by a trial court . . . unless the damages are so excessive" as to "create the impression that the jury has been influenced by passion or prejudice or has in some way misconceived or misunderstood the facts or the law." *Downer v. CSX Transp., Inc.*, 507 S.E.2d 612, 614 (Va. 1998).

The March 10, 2004, incident amounted to malicious conduct on McMillan's part toward King or at least evinced McMillan's conscious disregard of King's rights. The incident was the immediate by-product of King's wrenching decision

to seek another job in order to free herself from McMillan's oppressive harassment. McMillan forced King to submit to his harassing comments and physical contact. McMillan inappropriately commented on King's long hair, legs, and overall attractiveness. When King acknowledged that she was "seriously considering" quitting her job with McMillan, he said that she could have a "great career" in his office, and a better position immediately, if she would only "choose him" over her boyfriend. J.A. 279. He pulled her down and held her around the waist until she agreed to kiss him. This conduct evinced nothing short of a conscious disregard of King's rights to be free from harassment and to make uncoerced career choices. McMillan's battery of King warranted the imposition of punitive damages.

McMillan contends that, even if punitive damages were justified, the $100,000 amount was excessive because it reflected the jury's passion and prejudice upon hearing the testimony of other female employees — testimony that did not pertain to the March 2004 incident that formed the basis of the battery claim. The district court did not abuse its discretion in upholding the punitive damages award. The court properly instructed the jury that its punitive damages award, if any, should be fixed "using calm discretion and sound reason," uninfluenced by "sympathy or dislike." J.A. 490C. McMillan's conduct during the March 2004 meeting was beyond egregious. The district court properly concluded that the jury, in compliance with the court's instructions, based its punitive award on McMillan's treatment of King during the relevant incident, not McMillan's behavior towards other female employees.

We also reject McMillan's contention that the amount of damages (as remitted) on the battery claim was excessive. A trial court's evaluation of an award of compensatory damages is less searching than its evaluation of an award of punitive damages. A "trial judge's determination that a jury's award of compensatory damages is not excessive will not be set aside

unless the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice." *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1414 (4th Cir. 1992) (internal citations omitted). For punitive damages, however, the trial court "must compare its own independent judgment on the appropriate amount with the jury's award to determine whether the jury's award is so excessive as to work an injustice." *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 548 (4th Cir. 2003). We review the district court's determinations for abuse of discretion. *Id.*

The district court reasoned that the jury's compensatory damages award of $175,000 on King's battery claim was excessive because it significantly exceeded the compensatory award on her Title VII claim, which encompassed far more of McMillan's unlawful conduct. The court believed that the compensatory damages award for battery "appear[ed] to include a punitive element." J.A. 512. The court accordingly remitted the compensatory damages to $50,000 — the same amount awarded on the Title VII claim. We agree with the court's reasoning and conclude that it acted well within its discretion by choosing to remit the compensatory damages for battery. The resulting $50,000 award was not excessive. The jury's verdict that McMillan committed battery against King was not against the clear weight of the evidence, and the ultimate damages award is reasonable given the harm that King suffered, including her weight gain, TMJ, sleeplessness, and nightmares.

Nor did the district court abuse its discretion by declining to remit the punitive damages on the battery claim after remitting the compensatory damages. As discussed above, the evidence supported a punitive damages instruction under Virginia law. That the district court found an apparent punitive element in the compensatory award — and corrected for that by remittitur — does not mean it was also obliged to remit the punitive award. The purpose of compensatory damages is to make the injured plaintiff whole for losses actually

suffered, whereas punitive damages serve to "punish the defendant for malicious conduct or to display to others an example of the consequences they may expect if they engage in similar conduct." *F.B.C. Stores, Inc. v. Duncan*, 198 S.E.2d 595, 599 (Va. 1973). In light of these objectives, we cannot say that the district court abused its discretion by leaving the jury's punitive award for battery undisturbed. An award of punitive damages must bear a reasonable relationship to compensatory damages, *Little v. Cooke*, 652 S.E.2d 129, 142 (Va. 2007), and the district court acted within its discretion by independently determining that the $100,000 punitive award was not disproportionate to the compensatory award, remitted to $50,000.

E.

The district court did not abuse its discretion in denying McMillan's and Johnson's motions for a new trial under Rule 59. "In considering a motion for a new trial, a trial judge may weigh the evidence and consider the credibility of witnesses, and if he finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, he must set aside the verdict, even if supported by substantial evidence, and grant a new trial." *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1237 (4th Cir. 1995) (internal citations omitted). "The decision to grant or deny a motion for a new trial is within the sound discretion of the district court and will not be disturbed absent a clear showing of abuse of discretion." *Id.* As our previous discussion establishes, the jury's verdicts on liability and the ultimate damages assessments are not against the clear weight of the evidence, nor do they in any way perpetuate a miscarriage of justice. In particular, the district court acted within its discretion by remitting the compensatory damages on the battery claim rather than granting a new trial.

## III.

The judgment of the district court is

*AFFIRMED*.